**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **Geneva Fielding, on behalf of her minor child, G.C.,** | ) ) ) ) |
| **Plaintiff,** | ) ) ) |
| **v.** | ) ) |
| **Michael J. Astrue, Commissioner, Social Security Administration,** | ) ) ) ) |
| **Defendant.** | ) ) ) |

Civil Action No. 09-11958-DJC

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                             August 30, 2011

**I.      Introduction**

Plaintiff Geneva Fielding ("Fielding") filed a claim, on behalf of her minor child, G.C., for

supplemental security income ("SSI") with the Social Security Administration.  Pursuant to the

procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Fielding brought

this action for judicial review of the final decision of  Defendant Michael J. Astrue, Commissioner

of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge

("ALJ") on June 2, 2009, denying her claim.  The Decision Review Board ("the Board") selected

the ALJ's decision for review but failed to act on the claim within the requisite time period.

Accordingly, the ALJ's decision is the final decision of the Commissioner.

Before the Court are Fielding's motions to reverse the ALJ's decision and award SSI to her

child G.C., or, alternatively, to remand the ALJ's decision, and the Commissioner's motion to affirm

that decision.  In her motion, Fielding claims that the ALJ erred in denying her claim because  the

ALJ's holding that G.C. had a less than marked limitation in the functional domain of attending and completing tasks was not supported by substantial evidence. (Pl. Br. 4). This Court finds, however, that there is substantial evidence in the record to support the ALJ's findings, and, therefore, the Commissioner's final decision is AFFIRMED.

## II.     Factual Background

G.C. was born on July 1, 1996 and is currently a school-age child. R. 10.[1]   In Fielding's June 4, 2007 application, on behalf of G.C., for SSI with the Social Security Administration ("SSA"), Fielding alleged G.C.'s disability on the basis of a learning disability and asthma. R. 49.

## III.    Procedural Background

Fielding filed claims for SSI with the SSA on June 4, 2007, asserting that her child was disabled due to a learning disability and asthma. R. 48. After initial review, Fielding's claim was denied on September 26, 2007. R. 54. Her claim was reviewed by a Federal Reviewing Official and again denied on July 12, 2008. R. 50. On July 29, 2008, Fielding filed a timely request for a hearing before an ALJ pursuant to SSA regulations. R. 7. A hearing was held before an ALJ on May 20, 2009. R. 7. In a written decision dated June 2, 2009, the ALJ determined that G.C. did not have a disability within the definition of the Social Security Act and denied G.C.'s claim. R. 7-18.

Although the ALJ notified Fielding that the SSA's Decision Review Board ("the Board") selected her claim for review, the Board did not complete its review of Fielding's claim during the requisite time period. R. 1. Accordingly, the ALJ's decision is the Commissioner's final decision. R. 1.

---

[1] Citations to the administrative record in this case, Docket No. 12, shall be to "R. __."

**IV.     Discussion**

**A.  Legal Standards**

**1.  Entitlement to Disability Benefits and Supplemental Security Income**

A claimant's entitlement to SSI turns in part on whether he has a "disability," defined in the

Social Security context as an "inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

has lasted or can be expected to last for a continuous period of not less than twelve months."  42

U.S.C. §§ 416(i), 423(d)(1)(a); 20 C.F.R. § 404.1505.  The inability must be severe, rendering the

claimant unable to do his or her previous work or any other substantial gainful activity that exists

in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The Commissioner or his designee must follow a three-step evaluation process to determine

whether an individual under the age of eighteen is disabled for Social Security purposes and, thus,

whether that individual's application for benefits will be granted.  20 C.F.R. § 416.924(a).  All three

steps are not applied to every applicant; the determination may be concluded at any step along the

process.  See id.  First, if the applicant is not engaged in substantial gainful work activity, then the

ALJ proceeds to the next step.  Id.  Second, if the applicant is not engaged in substantial gainful

work activity and has a severe impairment or severe combination of impairments, then the ALJ

proceeds to the next step.  Id.  Third, if the impairment is severe, the Commissioner must determine

if the impairment meets, medically equals, or functionally equals the "listed" impairments in the

Social Security regulations.  Id.  If an applicant has such an impairment and it meets the duration

requirement, then the application is granted.  Id.

To determine if a severe impairment functionally equals the listings, the ALJ will assess the

applicant's functional capacity in terms of six domains: i) acquiring and using information; ii) attending and completing tasks; iii) interacting and relating with others; iv) moving about and manipulating objects; v) caring for oneself; and vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). For a child's impairment or impairments functionally to equal the listings, they must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). In assessing whether the child has a "marked" or "extreme" limitation, the ALJ must consider the functional limitations from all medically determinable impairments, including impairments that are not severe. Id. The regulations define a "marked limitation" in a domain as one that "interferes seriously" with a child's ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme limitation" in a domain is one that is more than marked and interferes "very seriously" with a child's ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

### 2. Standard of Review

This Court has the power to affirm, modify, or reverse a decision of the Commissioner upon a review of the pleadings and record. 42 U.S.C. § 405(g). Such review, however, is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996)). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citations omitted). Thus, if the ALJ made a legal or factual error, Manso-Pizarro, 76 F.3d at 16, the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard. See 42 U.S.C. § 405(g).

## B. Before the ALJ

### 1. Medical History

There was extensive evidence concerning G.C.'s impairments, including diagnoses and treatment, before the ALJ, particularly in regard to the conditions upon which Fielding relied in her application for SSI benefits. The severity of G.C.'s learning disability, not his asthma, is the only issue raised in Fielding's petition for review.

#### a. Learning Disability

From November 2005 through May 2006, G.C. attended a reading program at the Massachusetts General Hospital Reading Disability Unit. R. 388. G.C. "enjoyed word memory games and rewards for his achievements," and was "personable, motivated, and very kind." R. 388.

In September 2007, G.C. underwent a consultative examination with Jeffrey Jampel, Ph.D. R. 227. Fielding reported to Dr. Jampel that G.C. had a learning disability and problems with anger associated with his frustration caused by his learning disability. R. 227. Fielding further noted that G.C. was receiving special needs services, including "one on one" contact five days a week primarily for reading. R. 228. Dr. Jampel stated that G.C. had not been prescribed any medications and that none had been recommended. R. 228. Additionally, Dr. Jampel reported that G.C. was able to provide for personal hygiene and personal care without difficulty, that G.C. did chores "quite well

and meticulously," including cleaning the bathroom and his bedroom, taking out the trash, and assisted his brother in making his brother's bed. R. 228. G.C. stated that he liked to play video and card games, draw, and play football, basketball and bike. R. 229. G.C. was also on the swim team at the Girls and Boys Club. R. 229. Dr. Jampel reported that G.C. "made his best efforts on the [tests] administered to him," but "persevered on those [tests] that he found difficult." R. 230. Overall, G.C. obtained an IQ of 87 and fell in the "broadly average range." R. 230. Dr. Jampel noted that G.C.'s potential was likely higher. R. 231. Dr. Jampel concluded that G.C. "would be able to carry out and remember instructions" and diagnosed him with Specific Reading and Arithmetic Disability. R. 232.

On August 2, 2007, Sheela Gurbani completed a childhood disability evaluation form on behalf of the SSA. R. 233-38. This assessment reported that G.C. had a less than marked limitation in acquiring and using information and in health and physical well-being. R. 235-36. Additionally, the assessment did not report any limitation in G.C.'s ability to attend and complete tasks. R. 235. The report concluded that G.C.'s statements were credible and that, from a functional standpoint, G.C. did not meet or equal the listings. R. 238.

On December 12, 2008, Elizabeth Caronna, M.D., a developmental and behavioral pediatrician at Boston Medical Center, completed a childhood disability determination analysis of functional areas form. R. 513-17. Dr. Caronna concluded that G.C. had a marked limitation in the functional domain of acquiring and using information due to his dyslexia. R. 514. Dr. Caronna did not find any limitations in any of the other functional domains. R. 513-17. This form did note, however, that G.C. had difficulty independently initiating, sustaining, or completing activities related to school and homework. R. 516. In another report, Dr. Caronna stated that G.C. was quite

6

intelligent and had strengths in understanding and oral language but that he had significant difficulties in reading, writing, spelling and math calculations. R. 240. She recommended that G.C. transfer to a school more suitable to his learning difficulties. R. 245.

In an April 2008 teacher questionnaire, G.C.'s fifth-grade teacher Dolores Martinez reported that G.C. had mostly "serious" or "obvious" problems in the domain of attending and completing tasks. R. 136. Ms. Martinez noted that G.C. needed constant encouragement to complete reading and writing activities independently, but that he was able to complete math activities independently while checking-in to ensure understanding of a concept. R. 135. She further reported that G.C. worked best with one-on-one support, although G.C. was beginning to attempt familiar tasks without adult support. R. 136. Ms. Martinez stated that G.C. was able to complete homework assignments if he worked with a family member, but that he lacked self-motivation and would not complete assignments if no one was able to assist him. R. 136. Although Ms. Martinez indicated that G.C. tended to become unfocused during difficult tasks, she noted that G.C. had no problem sustaining attention during play or sports activities or when waiting to take turns and had only a slight problem paying attention when spoken to directly. R. 136.

In a December 17, 2008 questionnaire, G.C.'s sixth-grade teachers, Gar-Hay Kit and Scott Larivee, reported that G.C. was quick to give up when presented with difficult tasks and that G.C. had difficulty reading grade-level texts, struggled to organize his thoughts in writing and had difficulty completing homework assignments outside of the classroom. R. 518-19. The teachers reported, however, that G.C. was able to perform many of the same tasks and activities as his peers, given academic support and could complete assignments when he was calm. R. 518, 520. G.C.'s teachers also noted that G.C. enjoyed playing football and basketball and attended the Girls and

Boys Club near his home. R. 518.

### 2. ALJ Hearing

At the May 20, 2009 administrative hearing, the ALJ heard testimony from three witnesses, Fielding, G.C., and Jonathan Megerian, M.D., a medical expert ("ME"). G.C. testified that at school he receives reading services; his teachers work independently with him on his reading and anger management. R. 26-27. G.C. elaborated that sometimes he is frustrated in class due to his learning disability and "puts [his] head down." R. 27. G.C. also acknowledge that he receives" a lot of one-on-one attention at school." R. 27. G.C. testified that outside of school, he plays lacrosse at the Boys and Girls club. R. 27.

Fielding testified that G.C. had been diagnosed with a learning disability and dyslexia. R. 28. She elaborated that even before G.C. had started school, he seemed "behind the other children" had a limited vocabulary. R. 29. These problems persisted throughout the beginning of his schooling, and in first grade G.C. was placed on a Special Education plan at the Mission Hill School. R. 30. Fielding further stated that G.C. is currently at the Mary Lyon School and he transferred because the Mary Lyon School "specializes with kids with disability." R. 30. Outside of school, G.C. attended a program at Massachusetts General Hospital ("MGH") and received free tutoring from other programs. R. 30. Fielding also testified that G.C. was receiving behavioral services at school due to his anger and depression associated with his learning disability. R. 30-31. Fielding indicated that G.C. was on a waiting list at Arbour Counseling to receive individual counseling to deal with his anger and depression. R. 32. A counseling team also comes to G.C.'s home for family therapy. R. 33.

As to G.C.'s learning disability, Fielding testified that when she sits down with G.C. to read

he still "struggles to put words together." R. 34. Fielding stated that a school bus picks up G.C. in front of his house because G.C. is unable to read signs and "get from A to B." R. 34. Fielding further stated that G.C. has constant one-on-one help with reading and other schoolwork and is "more successful when he has the one-on-one [help]." R. 35.

With respect to G.C.'s out-of-school activities, Fielding testified that G.C. sometimes goes to the Boys and Girls Club, where he plays lacrosse. R. 36. However, some days G.C. has little motivation to do anything and he stays in and plays video games. R. 36. Fielding further testified that G.C. is easy to get along with and that his hobbies include video games and drawing. R. 37, 39.

The ME testified that he is a licensed pediatrician and connected with Children's Hospital in Boston. R. 39. The ME indicated that he was present during the entire course of the hearing, had reviewed the exhibits in the case and had sufficient information to form an opinion concerning whether or not G.C. met or equaled a listed childhood impairment. R. 39-40. The ME elaborated that G.C. had a marked impairment in the domain of acquiring and using information. R. 40. Regarding G.C.'s ability to attend and complete tasks, the ME stated that Dr. Caronna reported that G.C. had no impairment in attending and completing tasks, but G.C.'s fifth-grade teacher reported that G.C. had a significant impairment in the same functional domain. R. 40. The ME continued that Dr. Caronna, as a developmental pediatrician, is "very well qualified" to diagnose learning disabilities like Attention Deficit Disorder ("ADD"), but that because G.C. had neither been diagnosed with nor treated for ADD, it was difficult to know whether G.C. had a marked impairment in the domain of attending and completing tasks. R. 40-41.

The ME further testified that G.C.'s impairment in the domain of attending and completing tasks is related only to school issues. R. 43. The ME suggested that Dr. Caronna did not list G.C.

9

as having a problem in attending and completing tasks because, "in her [Dr. Caronna's] mind, [G.C.'s] main issue with . . . attention is only around learning, [and] . . . if the only time [G.C.] has difficulty with attention and completing tasks is with the learning of difficulty [sic] materials, then [G.C.] really doesn't have problems with attending and completing tasks because it . . . doesn't pervade his whole life." R. 43-44. The ME concluded that G.C.'s marked impairment in acquiring and using information is his predominant problem and is having a "ripple affect [sic]" in other domains, but, nevertheless, G.C. does not have marked impairments in the other domains. R. 45.

### 3.     Findings of the ALJ

Following the three-step process, 20 C.F.R. § 416.924(a), at step one, the ALJ found that G.C. had not engaged in substantial gainful activity at any time relevant to the ALJ's decision. R. 10. Fielding does not dispute this finding.

At step two, the ALJ found that G.C. had the following severe impairments: learning disorder and asthma. R. 10. Fielding does not dispute this finding.

At step three, the ALJ found that G.C. did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments or an impairment or combination of impairments that functionally equaled one of the listed impairments. R. 12-18. Fielding does dispute this aspect of the ALJ's determination that G.C.'s impairment did not functionally equal one of the listed impairments. In determining the degree of limitation in each of the six functional domains, the ALJ determined that G.C. had a marked limitation in the domain of acquiring and using information but less than marked limitations in the other functional domains. R. 12-18. Accordingly, the ALJ found that G.C. was not disabled because G.C. neither had one extreme limitation nor two marked limitations in the functional domains.

### C.    Fielding's Challenges to the ALJ's Findings

#### 1.    Attending and Completing Tasks

Fielding contends that the ALJ erred in his step three findings by holding that G.C. had a less than marked limitation in the functional domain of attending and completing tasks.  (Pl. Br. 2).[2] Fielding argues that the ALJ's findings concerning this functional domain are not "premised on substantial evidence."  (Pl. Br. 4).

At step three, the ALJ must determine if a child claimant has a severe impairment that medically or functionally equals the listings.  20 C.F.R. § 416.924(a).  The relevant issue in this case is whether G.C.'s impairments functionally equal the listings, which required the ALJ to assess function in G.C.'s activities in terms of the six domains.  Id.  If a child has a "marked limitation – a limitation that "interferes seriously" with the ability to independently initiate, sustain, or complete activities – in two domains of functioning, then the ALJ must find the child to be disabled.  20 C.F.R. §§ 416.926a(a),(c),(e).  In assessing a child's functioning activities in terms of the six domains, an ALJ's findings must be supported by substantial evidence.  See Nguyen, 172 F.3d at 35; 42 U.S.C. § 405(g).  Here, the ALJ's findings that G.C. had a "marked limitation" in the domain of acquiring and using information and a "less than marked limitation" in the domain of attending and completing tasks and in the rest of the domains were supported by substantial evidence.

---

[2] In her complaint, Fielding claims that the ALJ's conclusion that G.C. has less than a marked limitation in the domain of health and physical well-being is contrary to the evidence on the record and requests that the Court find that G.C. has a marked limitation in that domain. Compl. ¶ 13.  The Court need not address this issue since Fielding neither states in her complaint nor advances any argument in her opening brief as to how the ALJ's conclusion that G.C. has less than a marked limitation in the domain of health and physical well-being is not supported by substantial evidence.

Numerous physician reports provide substantial evidence to support the ALJ's determination that G.C. had a less than marked limitation in the domain of attending and completing tasks. A consultative examination performed by Dr. Jampel reported that G.C. had a learning disability and anger management problems. R. 227. However, Dr. Jampel reported that G.C. was able to provide for personal hygiene and care without difficulty and could perform chores well and meticulously. R. 228. Dr. Jampel also noted, as G.C. and Fielding testified at the ALJ hearing, that G.C. likes to draw, play video games, and attend the Boys and Girls Club where he participates in numerous sports. R. 27, 36, 39, 229. Overall, G.C.'s IQ score fell into the broadly average range, and Dr. Jampel reported that G.C. "made his best efforts on the [tests] administered to him" even as he "persevered on those [tests] that he found difficult." R. 230.

Dr. Gurbani performed a childhood disability evaluation on behalf of the SSA, reporting specifically that G.C. did not have any limitation in his ability to attend and complete tasks. R. 235. The report concluded that G.C.'s statement were credible and that from a functional standpoint G.C. did not meet or equal the listings. R. 238. This evidence further supports Dr. Jampel's assessment. R. 230. Similarly, a childhood disability analysis performed by Dr. Caronna reported specifically that, despite having a marked limitation in the functional domain of acquiring and using information, G.C. had no limitation in his ability to attend and complete tasks or in any of the other domains. R. 513-17.

Finally, Dr. Megerian, the ME at the ALJ hearing, testified that Dr. Caronna was "very well qualified" to diagnose learning disabilities like ADD, R. 40, but because G.C. had neither been diagnosed nor treated for ADD, it was difficult to know if G.C. had a marked impairment or not in the domain of attending and completing tasks. R. 42-43. However, the ME further testified that

G.C. "doesn't really have a problem with attending and completing tasks because it's only related

to school issues." R. 43. Additionally, the ME suggested that Dr. Caronna did not list G.C. as

having a problem in attending and completing tasks because the doctor might have thought that since

G.C.'s main issue concerning attending and completing tasks only involved his difficulties in school,

"it doesn't pervade his whole life" and therefore would not constitute an impairment in the domain

of attending and completing tasks. R. 43-44.[3]

In sum, the ALJ had more than substantial evidence to support his finding that G.C. had a

less than marked limitation in the domain of attending and completing tasks. Drs. Gurbani and

Caronna both specifically reported that G.C. had no limitation in his ability to attend and complete

tasks. See R. 235, 513-17; see also R. 230 (Dr. Jampel's conclusions on his "best efforts on tasks

administered to him"). The ME testified at the hearing that Dr. Caronna was well-qualified to

diagnose ADD and did not do so in her examination of G.C. and stated that G.C.'s difficulties at

_____

[3]Fielding notes correctly that the ME testified that G.C.'s impairment in the domain of
attending and completing tasks relates only to G.C.'s schoolwork. See R. 43. However,
Fielding then improperly jumps to the conclusion that G.C. has a *marked* limitation in attending
and completing tasks in school on the basis of G.C.'s fifth-grade teacher's assessment. (Pl. Br.
6). That medical reports such as Dr. Caronna's appear to be in conflict with a teacher's
assessment in the record does not mean in this case that the ALJ lacked substantial evidence to
support his findings, particularly where the report is consistent with other assessments of several
doctors as discussed above. As discussed, the ALJ's decision is supported by the reports and
testimony of several doctors. Fielding also argues that Dr. Caronna's conclusion that G.C. has
no limitation in the domain of attending and completing tasks is "offset if not superseded three
pages later in the same report" where Dr. Caronna affirmed that G.C. has difficulty
independently initiating, sustaining, or completing tasks. (Pl. Br. 7). This argument also lacks
merit because the latter affirmation by Dr. Caronna does not address the severity of G.C.'s
difficulty independently initiating, sustaining, or completing tasks and this affirmation by Dr.
Caronna, upon review of the record, refers to school and homework activities. R. 516. This is
entirely consistent with the ME's testimony at the ALJ hearing that G.C.'s impairment in
attending and completing tasks relates only to school issues, which the ME viewed as part of
G.C.'s marked impairment in acquiring and using information. See R. 43.

school were part of his marked limitation in the domain of acquiring and using information. R. 43.

Fielding emphasizes the questionnaire provided by G.C.'s fifth-grade teacher that indicates that G.C. had mostly "serious" or "obvious" problems in the domain of attending and completing tasks. R. 136. However, G.C.'s fifth grade teacher is not "an acceptable medical source." See 20 C.F.R. §§ 404.1513(a); 416.927; see also Jamerson v. Chater, 112 F.3d 1064, 1067 (9th Cir. 1997) (refusing to consider a special education teacher without a doctoral degree to be an "acceptable medical source"). A teacher is an "other source" under 20 C.F.R. § 404.1513(d) and 416.913(d), and, as a result, the ALJ can accord her opinion "less weight than opinions from acceptable medical sources." Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996). Here, the ALJ noted that G.C.'s teacher opined that G.C. is "more restricted" than the record as a whole establishes and pointed to the medical opinions in the record that indicate that G.C. is not disabled. R. 13. The ALJ was entitled to afford more weight to the opinions of the physicians as acceptable medical sources, than those of G.C.'s teacher. Moreover, if certain evidence (G.C.'s teacher's opinion) conflicts with other evidence in the record (physicians' opinions), such conflicts are for the ALJ to resolve. See Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). "We must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence," which has occurred here. Id. (citing Lizotte v. Sec'y of Health and Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

## V.    Conclusion

Based on the foregoing, the Commissioner's motion to affirm is GRANTED and Fielding's

motion to reverse or, alternatively, to remand is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge